UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ILLINOIS NURSES ASSOCIATION, | |
| Plaintiff, | |
| v. | No. 24 CV 12379 |
| MARK ROSENBLATT, et al., | Judge Georgia N. Alexakis |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

The Illinois Nurses Association ("the Association") is a labor union representing registered nurses in Illinois. The Association sued a number of officials and employees (collectively "defendants") of the University of Illinois Hospital system ("the Hospital"), alleging that member nurses at the Hospital were directed to provide nursing care across state lines in violation of state criminal statutes. [1-1]. Defendants removed to federal court[1] and now move to dismiss.

For the reasons given below, defendants' motion to dismiss is granted. [12].

**I. Legal Standards**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege facts sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A court must accept the complaint's factual allegations as true and draw all reasonable inferences in the

---

[1] Defendants' notice of removal identifies a Title VII claim as the basis for federal question jurisdiction. [1] at 3. The Association brings no such claim but does bring a claim under 42 U.S.C. § 1983. The Court understands this § 1983 claim to be the basis for removal, and the reference to Title VII to be a typographical error.

plaintiff's favor (as the Court does in the section that follows), but it need not accept legal conclusions or "threadbare recitals" supported by "mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II. Background

The Association represents 1,750 registered nurses employed by the Hospital, a large and sophisticated hospital system that attracts patients from across the Midwest and the country. [1-1] ¶¶ 26, 33–34. The complex health care services the Hospital provides, like organ transplants, often require nurses to communicate with and care for patients both before and after they are physically present in the Hospital. *Id.* ¶¶ 37–38. Patients' post-care needs can be "particularly acute" in departments like neurology and transplants, where medical issues can be "highly time sensitive and a failure to provide timely care to a patient can have significantly adverse results for that patient." *Id.* ¶ 43.

Nurses at the Hospital provide "telehealth nursing care" to patients seeking follow-up care. *Id.* ¶¶ 44–46. Patients also can use web-based services to send healthcare requests and questions, which are routed to the relevant nurses. *Id.* ¶ 47. The Hospital does not require patients to disclose their physical location for either telephonic or web-based care and, as a result, it is reasonable to infer, the nurses to whom the requests are directed may not know whether patients are located in Illinois. *Id.* ¶ 48. Providing care to out-of-state patients is unlawful in many states, but nurses are reluctant to withhold care given the potentially dire consequences for patients. *Id.* ¶¶ 50–51, 106–15.

2

Nurses at the Hospital who are represented by the Association have informed their supervisors repeatedly that this method of telehealth nursing care exposes them to potential liability, but they have been instructed to provide care regardless. *Id.* ¶¶ 51–52. These objections have been made both orally at the time the nurses are instructed to provide care and via written Assignments Despite Objections ("ADOs"), where a nurse provides care under written objection. *Id.* ¶ 52.

The Association references at least 17 occasions where member nurses were directed to provide telehealth nursing services to patients located outside of Illinois. *Id.* ¶¶ 54–71. Based on Freedom of Information Act requests submitted to the Hospital, the Association learned that "the Hospital provided care to 4,099 unique patients who 'did not have an Illinois address'" in Fiscal Year 2024 (July 2023–June 2024). *Id.* ¶ 72. And the Association estimates that in the transplant and neurology departments alone, at least 150 out-of-state patients require follow-up care each year. *Id.* ¶¶ 73–74.

A nurse that refuses an out-of-state telehealth assignment may be subject to discipline under both Hospital policy and the nurse's state licensing agency. *Id.* ¶ 76. The Association has requested a policy change from the Hospital to prevent nurses from being assigned to provide telehealth care to out-of-state patients, but no change has been made yet despite labor-management meetings on May 2, 2024, and June 6, 2024. *Id.* ¶¶ 81–84.

In September 2024 the Association informed the Hospital of its intent to file the instant lawsuit seeking declaratory relief unless defendants agreed to a policy

change. *Id.* ¶ 85. In response, the Hospital asserted that its policy was to not have nurses provide potentially unlawful care to out-of-state patients and issued a guidance letter to nursing staff. *Id.* ¶¶ 86–87. The guidance letter included the following:

> **Q: How do you determine a patient is located outside of Illinois?**
>
> A: A patient is considered "out-of-state" based upon the patient's physical location at the time of receiving healthcare services. If a patient comes to Illinois to receive care in Illinois, they can be treated by an Illinois-licensed nurse. There is no requirement to ask where the patient is located for synchronous (telephone call) and asynchronous (message sent through [web-based]) communications.

*Id.* ¶ 87.

The Association contends that this language "implicitly encouraged [the Hospital's] nurses not to confirm whether the patients they were providing services to were located out of state." *Id.* ¶ 88. The guidance letter also does not indicate what constitutes "nursing services" in different states, despite those definitions varying. *Id.* ¶ 93. The guidance does not solve the problem, the Association asserts, because nurses are strictly liable for the unlawful practice of nursing in at least four of the states involved in the ADOs so far. *Id.* ¶¶ 94–96. Ignorance thus cannot shield the member nurses from liability. *Id.* ¶ 96.

On October 11, 2024, the Association sued defendants in Illinois court. [1-1]. The Association seeks both a declaration, *see* 735 ILCS 5/2-701 (Illinois Declaratory Judgment Act), that it would be unlawful under the Illinois Whistleblower Act to discipline nurses for refusing to violate state laws prohibiting out-of-state nursing care, as well as a preliminary injunction prohibiting defendants from engaging in

such discipline. *Id.* ¶¶ 116–38. The Association also seeks damages and injunctive relief under 42 U.S.C. § 1983, arguing that the Hospital's current policy deprives the member nurses of "a protectable liberty interest in not being coerced, induced, or misled into violating the criminal laws of any state" as well as "their professional and ethical responsibilities required by their nursing licenses," in violation of their rights under the Fourteenth Amendment's Due Process Clause. *Id.* ¶¶ 139–48.

Defendants removed to federal court on December 2, 2024, [1], and now move to dismiss. [12].

### III. Analysis

Defendants make three arguments for dismissal under Federal Rule of Civil Procedure 12(b)(6): that the Association lacks Article III standing to bring the suit; that the Association has not identified a cognizable liberty interest to support the § 1983 claim; and that no actual case or controversy exists that could support a declaratory judgment for the Whistleblower Act claim. [13] at 1. The Court goes through each argument in turn.

#### A. Standing

Because standing is "an essential component of a federal court's jurisdiction to resolve parties' disputes," *Spuhler v. State Collection Serv., Inc.*, 983 F.3d 282, 284 (7th Cir. 2020), the Court begins with defendants' argument that the Association lacks standing to bring its claims. [13] at 14–15. An organizations like the Association can sue either on behalf of its members (associational standing) or on behalf of the organization itself (organizational standing). *See United African Org. v. Biden*, 620 F. Supp. 3d 756, 765 (N.D. Ill. 2022); *see also Common Cause Indiana v. Lawson*, 937

5

F.3d 944, 949 (7th Cir. 2019). The operative complaint invokes both sorts of standing. [1-1] ¶¶ 2, 28–29.

With respect to organizational standing, the Association alleges that it "has suffered and will suffer independent injury because of the significant costs associated with challenging discipline given to nurses." [1-1] ¶ 29. Defendants do not challenge this assertion, nor do they otherwise challenge the Association's organizational standing. The Association therefore has alleged a concrete injury that supports organizational standing traceable to defendants' conduct. *Common Cause Indiana*, 937 F.3d at 952–53 (organizations sufficiently alleged an injury in fact on their own behalf based on "drains on their resources").

To establish associational standing, the Association must establish that "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 639 (7th Cir. 2017) (cleaned up). Defendants challenge only the first prong. [13] at 15. To satisfy the first element—individual members of the Association must have standing to sue in their own right—those members must have suffered a concrete injury-in-fact that would support individual Article III standing. *See Flynn*, 863 F.3d at 639. Defendants argue that the Association "has failed to specifically identify a single member who has been, or imminently will, suffer a concrete, particularized, and actual harm," and thus neither the members nor the Association have standing under Article III. [13] at 15.

6

To establish that a member has suffered an Article III concrete injury-in-fact, the Association must plead facts showing an injury that is "actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). The Supreme Court recently has clarified that a concrete injury can include something like a "conscience injury." *Id.* at 387. So, for example, "doctors would have standing to challenge a government action that likely would cause them to provide medical treatment against their consciences." *Id.*; *see also id.* ("The Government correctly acknowledges that a conscience injury of that kind constitutes a concrete injury in fact for purposes of Article III.").

The Association has alleged something at least as concrete as a violation of conscience: According to the complaint, the member nurses must either violate state law by treating out-of-state patients as instructed or their ethical and professional obligations by refusing to do so. [1-1] ¶¶ 75–76; *see also id.* ¶ 28. And this is not a speculative risk. The Court reasonably infers from the facts alleged that the Association's members *already* have incurred potential criminal liability as a result of the defendants' policies. *See id.* ¶¶ 95–96 (alleging that nurses already have provided care, over their objections, in at least four states with strict-liability statutes). In the constitutional context, the "credible threat of prosecution is sufficient to establish injury in fact." *File v. Martin*, 33 F.4th 385, 389 (7th Cir. 2022). The Court does not see any reason why a credible threat of criminal prosecution—or, in the

7

alternative, a credible threat of professional discipline—would be insufficient to establish an Article III injury in this non-constitutional context.

As pleaded, the nurses have two options: they can choose to risk criminal liability, or they can risk professional discipline. And both threats are, as alleged, credible. In this regard, the circumstances here differ meaningfully from the circumstances in *Alliance for Hippocratic Medicine*. There, the Supreme Court concluded that the plaintiff doctors had not actually demonstrated a conscience injury because, owing to the protection of federal conscience laws, the plaintiff doctors had "not shown that they could be forced to participate in an abortion or provide abortion-related medical treatment over their conscience objections." 602 U.S. at 387–88. Likewise, in *Whole Woman's Health v. Jackson*, 595 U.S. 30, 48 (2021), petitioners could not establish personal injury fairly traceable to a private defendant's allegedly unlawful conduct because the private defendant had supplied an uncontested, sworn declaration attesting that "he possesses no intention to file an S.B. 8 suit against [petitioners]."

But the record here reflects no similar assurance of immunity for the member nurses. This case therefore compares favorably with *South-Suburban Housing Center v. Greater South Suburban Bd. of Realtors*, where an association of realtors sufficiently established injury-in-fact because "*the threat* of professional discipline inhibit[ed] member realtors" from handling listings subject to marketing directives that, in the member realtors' view, violated fair housing obligations and the realtors' professional code of ethics. 935 F.2d 868, 878–79 (7th Cir. 1991) (emphasis added).

*See also N. Texas Equal Access Fund v. Thomas More Soc'y*, 728 F. Supp. 3d 887, 895 (N.D. Ill. 2024) (agreeing that plaintiffs had a cognizable Article III injury where they had alleged "that, by aiding and abetting abortions, they have engaged in conduct that exposes them to civil liability under SB8").

Defendants also argue, relying on *Do No Harm v. Pfizer Inc.*, 646 F. Supp. 3d 490, 500 (S.D.N.Y. 2022), that the Association lacks associational standing because no individual plaintiff has been named. [13] at 14. But Seventh Circuit precedent "allows for the member on whose behalf the suit is filed to remain unnamed by the organization." *Disability Rights Wisconsin, Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008). The Seventh Circuit has noted in the more recent *Prairie Rivers Network v. Dynegy Midwest Generation*, 2 F.4th 1002, 1011 (7th Cir. 2021), that a subsequent Supreme Court case, *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009), has been interpreted by some courts to expressly require member names for associational standing. *See, e.g., Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) ("[T]he Supreme Court has said that an affidavit provided by an association to establish standing is insufficient unless it names an injured individual."). But *Prairie River* expressly declined to find that *Summers* overruled this aspect of *Disability Rights*. *Id.* (reserving the question "for another day"). And other appeals courts have concluded that *Summers* did not impose a naming requirement. *See Am. All. for Equal Rights v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 773 (11th Cir. 2024) (*Summers* did not "impose[] a requirement that an organizational plaintiff identify affected members by their legal names."); *Speech First, Inc. v. Shrum*, 92 F.4th 947,

9

952 (10th Cir. 2024) (same). In light of *Prairie River*'s explicit (and recent) decision to leave the pertinent portion of *Disability Rights* intact, at least for now, coupled with the existence of other appellate court decisions demonstrating that *Summers* does not so obviously lead to the outcome for which defendants advocate, this Court remains bound to *Disability Rights. See also Am. All. for Equal Rts. v. Pritzker*, No. 3:24-CV-03299-SLD-RLH, 2025 WL 2229995, at *4 (C.D. Ill. Aug. 5, 2025) ("The State has not established that *Summers* entitles the Court to ignore binding authority like *Disability Rights Wisconsin* or persuasive authority like *Fearless Fund Management* and *Speech First*.").

The core issue is that "standing for at least one individual member remains an essential component of associational standing at each stage of litigation." *Prairie Rivers*, 2 F.4th at 1011. The Association has pleaded sufficient facts that, accepted as true, allow the Court to infer that identifiable individual member-nurses have standing, even if those individuals are not currently and literally named. *See, e.g.*, [1-1] ¶ 65 ("On July 1, 2024, a Union-member nurse in the Transplant unit, directed by Defendant Ghafari, was instructed to provide telehealth nursing services to a patient located and residing in North Carolina."). This is enough to establish the "essential component" of individual member standing at this phase. *Prairie Rivers*, 2 F.4th at 1011.

The Association therefore has sufficiently alleged Article III standing to bring the suit.

10

**B.      Section 1983**

The Association's § 1983 claim is premised on a deprivation of its members' liberty interest, which the Association defines as "not being coerced, induced, or misled into violating the criminal laws of any state" and "not being coerced, induced, or misled into violating their professional and ethical responsibilities required by their nursing licenses." [1-1] ¶¶ 140–41. The Court begins with whether such a liberty interest exists. Defendants argue that it does not because it is not a "deeply rooted essential right." [13] at 11.

The Court agrees that the Association has not identified a protectable liberty interest. The Association relies on the substantive component of the Due Process Clause of the Fourteenth Amendment, which must involve a governmental policy that "infringes upon a fundamental right or liberty." *Velleff v. Sheriff of Cook Cnty.*, No. 23-2785, 2025 WL 1898374, at *2 (7th Cir. July 9, 2025) (cleaned up). Any such right that is "not explicitly mentioned in the Constitution must have deep roots in our history and traditions" such that "the asserted right must be implicit in the concept of ordered liberty." *Id.* (relying on, among other cases, *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022), and *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)) (cleaned up). To state a constitutional claim based on a liberty interest, the Association must "provide a careful description of the right, with our country's history, legal traditions, and practices serving as critical guideposts." *Id.* (cleaned up).

The Association argues that its asserted liberty interest is analogous to the occupational liberty interest at issue in *Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005); *see also Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992)

11

("The concept of liberty protected by the due process clause has long included occupational liberty—the liberty to follow a trade, profession, or other calling.") (cleaned up).

*Dupuy* involved a class of childcare workers "who had been identified as perpetrators of child abuse or neglect in reports maintained on the State Central Register of the Illinois Department of Children and Family Services ('DCFS')." *Dupuy*, 397 F.3d at 496. The district court in *Dupuy* had concluded "that childcare workers effectively are barred from future employment in the childcare field once an indicated finding of child abuse or neglect against them is disclosed to, and used by, licensing agencies and present or prospective employers." *Id.* at 504; *see also id.* at 499. This effective exclusion from the field—as a direct result of state action— "squarely implicate[d] a protected liberty interest." *Id.* at 504. As a result, the Seventh Circuit upheld the district court's conclusion that the DCFS pre-and-post-deprivation processes were inadequate to protect the childcare workers' occupational liberty interest.

One key difference between the circumstances here and those in *Dupuy* is that the member nurses do not allege that, if they were to be disciplined or terminated by the Hospital or held criminally liable in other jurisdictions, they could not continue to be employed as nurses, be it at the Hospital or elsewhere. Thus, they have not alleged that they are excluded from the occupation of nursing. "It is the liberty to pursue a *calling or occupation*, and not the right to a specific job, that is secured by the Fourteenth Amendment." *Wroblewski*, 965 F.2d at 455. The Association is right

12

that, at this stage of the proceedings, the Court cannot dispute "the seriousness of the risk being borne by the nurses," [17] at 11, and as discussed in its standing analysis, based on the allegations before it, the Court infers that at least some members of the Association already have incurred potential criminal liability. Nevertheless, *Dupuy* and the other cases on which the Association relies, *see, e.g., Valmonte v. Bane*, 18 F.3d 992 (2d Cir. 1994), involve actual deprivation of an occupational liberty interest, not just an increased risk of deprivation, as alleged here.

Not all rights fall within the ambit of the Fourteenth Amendment. *C.f. DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1989) ("[N]ot all common-law duties owed by government actors were constitutionalized by the Fourteenth Amendment."). Simply put, the Association has not shown that the described liberty interest—freedom from coercion to violate other states' laws or professional regulations—flows from "our country's history, legal traditions, and practices." *See Velleff*, 2025 WL 1898374, at *2. They would be hard-pressed to do so, as the mandatory licensure regime underlying the complaint is a relatively recent innovation. *See* Diane Benefiel, *The Story of Nurse Licensure*, 36 NURSE EDUCATOR 16 (2011). And while the problem the member nurses face may echo that faced by the plaintiffs in *Dupuy*, an echo is not enough to show "deep roots in our history and traditions." *Velleff*, 2025 WL 1898374, at *2.

Because the Association has not identified a recognized protectable liberty interest, it has not stated a Fourteenth Amendment claim, and the Court dismisses the § 1983 claim on that basis.

### C. Illinois Whistleblower Act

The Association also brings a state-law claim under the Illinois Whistleblower Act, seeking both declaratory and injunctive relief. [1-1] ¶¶ 116–38. But the Court's jurisdiction was premised on the existence of a federal question. [1] ¶ 7; 28 U.S.C. § 1331; 42 U.S.C. § 1983. The Association is a union chartered in Illinois, [1-1] ¶ 11, and while neither the complaint nor the notice of removal identifies defendants' citizenships, all are alleged to be current employees of an Illinois hospital. The Court thus sees no possible basis for diversity jurisdiction, *Knopick v. Jayco, Inc.*, 895 F.3d 525, 528 (7th Cir. 2018) (court has "independent obligation to determine that jurisdictional requirements are satisfied"), and defendants have not met their "burden of persuasion for establishing diversity jurisdiction," *Hertz Corp. v. Friend*, 559 U.S. 77, 96 (2010).

The Court's jurisdiction over the state-law claim thus depends entirely on the exercise of supplemental jurisdiction under 28 U.S.C. § 1367. But "[w]hen federal claims drop out of the case, leaving only state-law claims, the district court has broad discretion to decide whether to keep the case or relinquish supplemental jurisdiction over the state-law claims." *RWJ Mgmt. Co. v. BP Products N. Am., Inc.*, 672 F.3d 476, 478 (7th Cir. 2012). Courts apply a "general presumption in favor of relinquishment" especially when, as here, "the state-law claims are complex and raise unsettled legal issues." *Id.* And, given the early phase of the case, the Court does not think the modest investment of its time in the case so far overcomes the presumption. *Id.*

The Court thus relinquishes supplemental jurisdiction over the Whistleblower Act claim. *See* 28 U.S.C. § 1367(c).

14

## IV. Conclusion

For the reasons stated above, defendants' motion to dismiss is granted, [12], although the dismissal is without prejudice and with leave for the Association to amend. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519 (7th Cir. 2015) ("[A] plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed.").

If the Association wishes to file an amended complaint curing the pleading and jurisdictional deficiencies identified by the Court, while still complying with its Rule 11 obligations, it may do so by 9/5/25. If no amended complaint is filed by 9/5/25, the dismissal of the Association's § 1983 claim will convert to a dismissal with prejudice; the state law claim will be dismissed without prejudice to effectuate the relinquishment of supplemental jurisdiction; and the Court will remand this matter to state court. *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").

_____
Georgia N. Alexakis
United States District Judge

Date: 8/22/25